Filed 4/14/25  In re J.F. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.F. et al., Persons Coming Under the Juvenile Court Law. | B335063 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Jeremiah F.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. Nos. 23LJJP00259A–B) |

APPEAL from orders of the Superior Court of Los Angeles County.  Debra L. Gonzales, Commissioner.  Affirmed.

Linda S. Votaw, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————————

## INTRODUCTION

Jeremiah F. (Father) appeals from jurisdictional findings and dispositional orders, declaring his children dependents of the juvenile court under Welfare and Institutions Code[1] section 300, subdivisions (b) and (j), removing them from his custody, and terminating jurisdiction with a custody order placing the children with their mother. On appeal, Father challenges the sufficiency of the evidence supporting the jurisdictional findings and removal order. He also contends the juvenile court committed reversible error in denying his motion to replace his appointed counsel, in refusing to admit certain evidence, in terminating jurisdiction, and in restricting Father's visitation to supervised. We conclude none of Father's arguments have merit, and accordingly, affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Initial dependency investigation

Father and Amanda F. (Mother) are the divorced parents of two children: J.F., a boy born in August 2013, and A.F., a girl born in January 2015. Prior to the start of these dependency proceedings, a family law court awarded sole legal and physical custody of the children to Father, and visitation to Mother, consisting of three weekends per month and every week from Thursday through Friday. The family law court also previously granted Father's request for a domestic violence restraining order against Mother. The restraining order was in effect until January 2024.

On July 7, 2023, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging

---

[1] Unless otherwise stated, all further undesignated statutory references are to the Welfare and Institutions Code.

medical neglect of J.F. by Father. According to the reporting party, Mother took J.F. to the emergency room earlier that day because he was having difficulty breathing related to asthma. The child was administered oxygen and medications. When Father arrived at the hospital, he was informed that J.F. was going to be admitted to the intensive care unit. However, Father disagreed with the doctor's assessment and decided to take J.F. home against medical advice.

That same day, the investigating social worker, along with two public health nurses, went to Father's residence. Father came outside and spoke with them. He stated that J.F. was doing well and "breathing fine." He also reported that he took J.F. home against the doctor's advice because a respiratory therapist at the hospital told him the child was "fine." Father denied that J.F. was diagnosed with asthma, and explained that the child had seasonal allergies as well as a cold a few days earlier. Although Father indicated that J.F. had an inhaler, he did not know the name of the child's primary care doctor. Father allowed the social worker and nurses to meet briefly with J.F. outside the home. After the child provided his name and age, Father instructed him to go back inside. Father declined the social worker's request to interview the children and conduct a home assessment.

Later that day, the social worker met with Mother and the children during Mother's visitation time with them. Mother indicated that J.F. had been diagnosed with asthma and used an inhaler when he was wheezing. She reported that she took J.F. to the Children's Hospital Los Angeles (CHLA) because she noticed that he was lethargic and walking slowly to the car, and he told her that his chest was "hurting really bad." After Father

arrived at the hospital, she went to the waiting room due to the protective order in place between them. Mother later learned that the medical staff wanted to admit J.F., but Father declined to follow their advice. At the social worker's request, Mother agreed to take J.F. to a local hospital or urgent care to be cleared medically.

In his interview with the social worker, J.F. reported that he could not sleep the night before, and that Father gave him the inhaler but it did not work. J.F. further stated that Mother took him to the hospital because he was not feeling well and his chest was "hurting." J.F. was aware that the hospital wanted to keep him there, but Father disagreed and took him home. J.F. indicated that he would use his inhaler when he had a "hard time breathing," though Father told him that the inhaler was "not good for him." J.F. also stated that he used to be allergic to two cats that Father had at his home because his eyes would swell up and he would have difficulty breathing. However, J.F. believed he was no longer allergic to the cats because he stopped having those symptoms.

DCFS subsequently received a report that, on July 8, 2023, Mother brought J.F. back to the CHLA emergency room due to exacerbated symptoms of asthma. It was reported that the attending physician had not been able to stabilize J.F., and the child might need to be admitted for further care. It also was reported that the police escorted Father from the hospital premises because he was being disruptive and making a scene. The medical staff was concerned that Father would not agree to J.F. being hospitalized if the physician was unable to stabilize the child and send him home.

In an interview with DCFS, the hospital social worker indicated that, when Father arrived at CHLA on July 8, 2023, he raised his voice at the front desk staff and demanded to see J.F. A paternal uncle who accompanied Father began to record the interaction despite being repeatedly asked to put his cell phone away. Although Father was told that he would see the child shortly, he refused to wait and snuck into the restricted area. After several hours, the hospital staff asked law enforcement to escort Father from the premises based on his refusal to comply with the staff's directives. Before leaving the hospital, Father was able to see J.F. and speak to the attending physician. The physician explained in detail what was wrong with J.F., and even allowed Father to listen to the child's breathing with his stethoscope. J.F. was discharged to Mother's care on July 9, 2023 after responding well to treatment. The hospital social worker assessed that Mother was compliant, forthcoming, and genuinely concerned for J.F.'s well-being. The social worker also noted that Father was more focused on the fact that Mother made him go to the hospital rather than on J.F.

During a July 10, 2023 telephone conversation with DCFS, Father expressed being upset that the agency instructed Mother to take J.F. for a medical clearance given that he had sole custody of the children. In response, DCFS explained that it needed to verify J.F. was medically cleared, and that the custody order allowed Mother to seek medical treatment for the children on an emergency basis. Father also complained that Mother took J.F. to CHLA rather than a hospital in their local area, and that she failed to disclose the name of the hospital to him. In addition, Father accused Mother of being a hypochondriac and having mental health issues, and claimed she was not making correct

5

judgment calls on behalf of the children. With respect to the July 7, 2023 hospital visit, Father reiterated that, even though the emergency room doctor wanted J.F. to remain in the hospital, he decided to take the child home because a respiratory therapist said he was doing well. Father also recalled that he told the hospital staff that J.F. needed to rest in his own bed, and that he would seek medical attention for the child if necessary.

On July 13, 2023, Father again declined DCFS's request to conduct a home assessment. When the social worker asked if he had scheduled a followup visit with J.F.'s primary care doctor, Father stated he was working on it. In response to the social worker's request that he inform her when that visit was scheduled, Father questioned why she cared and then stated he would think about it.

In a followup interview, Mother told DCFS that she took J.F. back to CHLA on July 8, 2023 because the child was having difficulty breathing. She also stated that J.F. started wheezing again a few days later, but he used his inhaler and was feeling better. While Mother denied being diagnosed with any mental health issues, she admitted she sought therapy for depression during her relationship with Father. J.F. similarly reported to DCFS that Mother took him back to the hospital after he told her that his chest was hurting. J.F. also confirmed that he had an inhaler at Father's home, but only used it if his chest hurt "[r]eally bad." The child described feeling safe in both parents' homes.

As part of its investigation, DCFS spoke with Dr. Lourdes Escalona, the emergency room physician who treated J.F. during his July 7, 2023 visit. According to Dr. Escalona, she made it clear to Father that J.F.'s airways "were very swollen," and

explained to him in detail the purpose of each medication that she administered. After treating J.F., Dr. Escalona informed Father that the child would need to be admitted to the hospital and likely taken to the intensive care unit because he was not responding to the treatment as well as she hoped. Father refused, however, to have J.F. admitted to the hospital, and stated that the child needed to go home and "relax." Dr. Escalona attempted to reason with Father, but noted that "nothing [she] said to him worked." She also hoped that a paternal uncle who was present at the hospital and claimed to be a medic in the military could help change Father's mind. But after reviewing J.F.'s medical chart which showed his oxygen levels were improving with the treatment, the uncle supported Father's decision to take the child home. Dr. Escalona further reported that Father refused to sign the paperwork indicating that he was removing J.F. from the hospital against medical advice. At one point, Father and the uncle asked the doctor whether J.F. would die if he left the hospital. Although Dr. Escalona replied that she could not answer that question with certainty, Father took the child home.

The respiratory therapist who treated J.F. at the hospital informed DCFS that the child "came in with increased difficulty breathing secondary to an asthma attack, where he required extra support and continuous breathing treatments to help reverse his condition." The therapist also reported that when J.F. left the hospital, he "still requir[ed] oxygen" and "needed another dose of the hour long medication." The therapist denied that Father consulted with him prior to taking the child home.

For its initial report, DCFS also obtained copies of some of J.F.'s records from his July 7 and 8, 2023 hospital visits.

7

According to the hospital social worker's report, Father requested that another medical team care for J.F. during the July 7 visit, and then decided to remove the child from the hospital against medical advice. Father refused to engage in a discussion with the medical staff about admitting J.F. to the hospital, and became verbally aggressive toward them. The report noted that the medical team felt strongly that J.F.'s removal from the hospital "puts him in imminent danger and would advise that [he] be taken to the nearest [e]mergency [r]oom." It also noted that Mother told the staff that Father belonged to a church that did not believe in Western medicine. A July 7 note from the charge nurse stated that Father was observed removing J.F.'s "IV, EKG leads, [and] Pox monitor," and that he left with the child against the advice of Dr. Escalona and without signing the necessary paperwork. A patient discharge summary from the July 8 visit indicated that J.F. was diagnosed with status asthmaticus, and included instructions to follow up with the child's primary care doctor "within 1-2 days unless otherwise specified."

**2.      Section 300 petition**

On July 31, 2023, DCFS filed a non-detained petition for J.F. and A.F. under section 300, subdivisions (b) and (j). The petition alleged the children were at substantial risk of harm based on Father's medical neglect of J.F.

On August 3, 2023, Father reported to DCFS that he took J.F. to his primary care doctor. He also claimed that he twice called the social worker to provide this information, but there was no answer. The social worker noted that she did not receive any calls from Father during her regular work hours or any voicemail messages from him. When the social worker asked Father if he was willing to provide medical information about

8

J.F., Father indicated that he would give the information to his attorney. He also stated that he wanted to be present during any interviews that the social worker conducted with the children.

At a hearing held on August 14, 2023, Father and Mother each made their first appearance in the case, and were appointed counsel. The juvenile court ordered that the children remain released to their parents under the existing family law order, and set the matter for an adjudication hearing. The court also ordered the parents to make the children available to DCFS, the children's counsel, and any public health nurses, and to comply with any home visits conducted by DCFS. In addition, the court ordered Father to provide DCFS with information about the children's current doctors.

### 3. DCFS's jurisdiction/disposition report

For DCFS's jurisdiction/disposition report, the dependency investigator interviewed Mother and the children regarding the allegations in the section 300 petition. In her interview, Mother recalled that, on the day she took J.F. to the hospital, she picked up the children for her visitation time and noticed that J.F. did not look well. His shoulders were hunched over and he labored to breathe. Mother decided to take J.F. to CHLA because it specialized in children, and she believed he would get better treatment there. Mother brought J.F. back to CHLA the following day because DCFS told her the child needed to be medically cleared, and she thought it was best to take him to the same hospital that previously treated him. Mother believed that Father would not approve of her taking J.F. to the doctor because he took a holistic approach to medical treatment that Mother considered to be extreme. Mother also expressed concern about J.F.'s asthma and allergies to cats, which Father owned. Mother

9

stated that after J.F. was diagnosed with asthma, Father told the child he would not use an inhaler because it was bad for him. In his interview, J.F. indicated that on the day that Mother took him to the hospital, he was wheezing but could breathe. The child also confirmed that he suffered the same symptoms on other occasions. When asked what treatment he received, J.F. reported that Father would give him oils and pills.

Although the dependency investigator also attempted to interview Father, he would not agree unless the interview could be recorded. Because DCFS's policy did not permit recorded interviews, the dependency investigator was unable to meet with him. While Father did provide the name of a pediatrician, when the dependency investigator contacted the doctor's office, she was informed that neither child was a patient there. In response to DCFS's request for clarification about the children's current doctor, Father stated that further questions should be directed to his attorney. As a result, DCFS had not been able to determine who the children's primary pediatrician was or where they had received medical care. In addition, Father still had not granted DCFS access to his home for a safety assessment.

In its jurisdiction/disposition report, DCFS also attached additional records from CHLA. The records showed that Mother brought J.F. to the emergency room in May 2022 for a persistent cough and difficulty breathing that started after the child came from Father's home. The doctor's notes from that visit indicated that J.F.'s symptoms were most likely due to a mild asthma exacerbation and cat allergy, and that the child's condition improved with treatment. The doctor's notes from J.F.'s July 7, 2023 visit stated that Dr. Escalona explained to Father that the child's condition was serious, and that she pleaded with him to

10

allow the medical team to continue the necessary treatment. The notes also stated that Father requested that J.F.'s "IV, cable and oxygen" be removed, and that he removed the "O2 Sat" on his own before the doctor had a chance check the child's oxygen level on room air. The doctor's notes from J.F's July 8, 2023 visit indicated that, while the child had not completely improved, he was "safe enough to be discharged" with a medication plan.

**4.    Children's detention from Father**

At a hearing held on October 4, 2023, the juvenile court noted its prior order allowing the children to remain in Father's home was conditioned upon him making the children available to DCFS and providing information about their medical providers. The court indicated that Father did not appear to be following that order, and advised his counsel that Father needed to comply with all conditions of the children's release.

In an addendum report filed on October 5, 2023, DCFS stated that Father continued to refuse its request to interview the children and to assess his home. Because Father would not allow DCFS to visit his residence or meet with the children unless he could record any contact, the agency had not been able to complete this portion of its investigation. DCFS also noted that it had not received any further information from Father about the children's current medical care.

On October 12, 2023, counsel for DCFS and counsel for the children joined in requesting that the juvenile court detain the children from Father and place them with Mother. The children's counsel reported that Father refused to allow an investigator from her office to visit his home, and that she was unable to confirm if the children still felt safe in Father's care. Father's counsel objected to a change in placement, arguing that Father's

11

request to record his contact with DCFS was reasonable and not a denial of access to the children. In addition, Father's counsel asked the court to continue the adjudication hearing so that she could review a banker's box of documents that Father brought to court that day.

After hearing from counsel, the court detained the children from Father, released them to Mother pending the adjudication hearing, and granted Father monitored visitation in a DCFS-approved setting. The court also continued the adjudication hearing to allow Father's counsel time to review the documents that he provided to her. At a separate hearing attended by Father and his counsel, the court denied Father's request to appoint a new attorney.

On October 19, 2023, Father told the social worker that he recently took the children for physical exams, but he refused to provide any further information and directed the social worker to contact his attorney. Father also refused to provide Mother with any medical information regarding the children, and objected to her taking the children to the doctor and having J.F. tested for allergies without his approval. Father later reported that the children's last physical exams were in July 2023. However, he again refused the social worker's request for additional information.

On November 1, 2023, Father's counsel asked the court to grant a further continuance. His counsel noted that Father provided her with additional documents the previous week, but she was unable to review them because she was out due to illness. The court again found good cause to continue the adjudication hearing. The court also reiterated to the parties

12

that both Mother and Father shared medical and educational rights over the children.

In a series of last-minute-information reports, DCFS stated that the children had dental exams in November 2023 and physical exams in December 2023. DCFS also noted that, on November 27, 2023, Mother reported that J.F. required breathing treatment after being around cats during a visit with Father. DCFS opined that Father knew J.F. was allergic to cats but continued to expose the child to that allergen despite its triggering effects on his asthma. DCFS further opined that, while Mother had shown an ability to meet the children's needs, Father had not demonstrated that he understood the importance of placing the children's medical and emotional needs first. DCFS recommended the court sustain the section 300 petition and terminate jurisdiction with a family law order granting joint legal custody to both parents and sole physical custody to Mother.

**5.     Jurisdictional and dispositional hearing**

Starting on January 9, 2024, the juvenile court held a combined jurisdictional and dispositional hearing. In addition to receiving into evidence DCFS's various reports, the court admitted three exhibits offered by Father. Those exhibits consisted of medical records for the children's July 22, 2023 visit to the Palmdale Urgent Care, and a July 31, 2023 prescription for an albuterol inhaler for J.F. The court denied Father's request to admit additional exhibits consisting of numerous character reference letters from Father's friends, family, and fellow church members.

Father was called to testify at the hearing by his counsel. According to his testimony, Father observed J.F. have mild wheezing and coughing on a few occasions. While Mother told

13

him in the past that J.F. was diagnosed with asthma, she refused to provide him with any documentation of the diagnosis. Prior to July 2023, Father last took the children to a doctor in early 2021, and they were both found to be in good health. In July 2023, following J.F.'s second visit to the emergency room, Father took the children for checkups at Palmdale Urgent Care, where no followup care was ordered. Father believed that J.F. could have mild asthma or seasonal allergies. He acknowledged that J.F. had a prescription for an inhaler, which child used six or seven times over the past two years. There were occasions when Father suggested that J.F. use the inhaler, and other times when he left the inhaler in the child's room and told him to use it if he needed it.

Before J.F. went to stay with Mother on July 7, 2023, the child had a cold and difficulty sleeping, but was feeling better. Mother later told Father that she was taking J.F. to the hospital, but she did not disclose which one. When Father arrived at CHLA, he felt that the doctor and hospital social worker were inexplicably hostile and accusatory toward him. Father's understanding of J.F.'s condition at the time was that the child was in the exact same state as when he left Father's home. He believed J.F. had some mild wheezing and cold symptoms, but was otherwise doing well. Father claimed the doctor refused his request for a second opinion, and physically grabbed his arm when he said wanted to take the child home. Father assured the hospital staff that he would take J.F. to an emergency room if there were any signs of oxygen deprivation. He denied knowing that there was a medical advisement for J.F. to remain at the hospital for more breathing treatments.

14

The following day, J.F. went back to Mother's home. Later that evening, Mother told Father that she was again taking J.F. to CHLA, but did not explain why. When Father arrived at the hospital, he waited 15 minutes to see J.F., and then entered the emergency area without permission so that he could make medical decisions for his son. Father was later asked to leave the premises for violating hospital policy, and he complied.

Father testified that he did not medically neglect J.F. in July 2023 because the child had a cold and needed to rest at home to heal. Father believed Mother initiated the dependency case to regain custody of the children after she lost custody "due to her instability." Father was asked if he would permit DCFS and the children's counsel to enter his home without recording them if the children were returned to him. Father replied that he would "take it as a situation by situation," and that he remained concerned about granting access based on "several inaccuracies" that were reported about him. Father wanted the juvenile court to award him sole legal and physical custody of the children with monitored visitation for Mother.

The jurisdictional and dispositional hearing resumed on January 12, 2024. Counsel for DCFS and counsel for the children joined in asking the court to sustain the petition as pled and remove the children from Father. They also joined in requesting that the court terminate its jurisdiction with a custody order granting sole physical custody to Mother, and joint legal custody to both parents with tie-breaking authority to Mother. They also requested monitored visitation for Father. Father's counsel asked the court to dismiss the petition in its entirety, and to either release the children to Father or grant him unmonitored and overnight visitation.

15

The juvenile court sustained the petition as pled, and declared J.F. and A.F. dependents of the court under section 300, subdivisions (b) and (j).  The court removed the children from Father and placed them with Mother.  The court also ordered the termination of jurisdiction over the children, but stayed the termination pending the receipt of a juvenile custody order grating joint legal custody to both parents, sole physical custody to Mother, and supervised visitation to Father.  The court set the matter for a juvenile custody order hearing.

**6.      Termination of dependency jurisdiction**

On January 25, 2024, Mother informed DCFS that the children returned from a recent visit with Father and disclosed spending time at Father's home.  Mother stated that Father's cats were not present in the home, but J.F. was exposed to cat hair during the visit and experienced symptoms of asthma when he returned to Mother.  DCFS reported that Father's home was not approved for visits because he continued to deny access to his home for an assessment.

On January 26, 2024, the court held the hearing on the proposed juvenile custody order.  Father's counsel stated that she discussed DCFS's latest report with Father, and that J.F. was only at his home for a short period to pick up some clothes.  His counsel also stated that Father believed that jurisdiction had been terminated, and he was allowed to take the children to his home as long as a monitor was present.  The children's counsel expressed concern that Father placed J.F. "in a situation where he knew [the child] could have an asthma attack, and he did it because he believed the court had dismissed jurisdiction, and he was free to do what he wanted."  In response, the court emphasized that, under its existing order, Father's visits were

not to take place at his home because it still had not been assessed by DCFS.  After hearing extensive argument from counsel, the court signed the custody and visitation order and lifted the stay terminating jurisdiction.

Father timely appealed.

## DISCUSSION

### 1.  Denial of motion to substitute counsel

Father contends the juvenile court erred in denying his motion to substitute appointed counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), and that following the denial of the motion, his attorney provided ineffective assistance of counsel.  We conclude Father's claims lack merit.

On October 12, 2023, the originally scheduled date of the adjudication hearing, Father made a *Marsden* motion to replace his court-appointed attorney.  At a *Marsden* hearing held with Father and his counsel, the juvenile court asked Father why he wanted a new attorney.  Father explained that, over the past five weeks, he repeatedly tried to reach his attorney by e-mail and telephone, and that she did not respond until about a week ago.  He also stated that, when they did talk, he "was not able to get the guidance or advice [he] was looking for legally."  Father noted that he was not questioning his counsel's competence, but he was concerned that she had done nothing to prepare for the case.  In response, counsel noted that she had an extensive conversation with Father at the initial hearing, but acknowledged there had been about a week delay in communicating with him following DCFS's filing of its jurisdiction/disposition report.  Counsel added that she "would defer to the court if [Father] believes there has been a breakdown in communication."

17

The juvenile court denied Father's motion. The court stated that Father's counsel appeared often in its court, and that she was an "extremely experienced" and "very dedicated" attorney. The court also noted that if counsel needed additional time to gather information to prepare for the case, she could seek a continuance. Based on the information provided by Father, the court found there was not a sufficient breakdown in communication to warrant the appointment of a new attorney. Following the denial of Father's motion, his counsel requested a continuance of the adjudication hearing so that she could review a banker's box of documents that Father provided to her that day. The court found good cause for counsel's request and granted the continuance.

*Marsden*, *supra*, 2 Cal.3d 118 addresses the circumstances under which criminal defendants have a right to the substitution of appointed counsel and the procedures to be employed by the trial courts in determining whether those circumstances exist. (*In re Samuel A.* (2021) 69 Cal.App.5th 67, 73, fn. 3.) "Because parents have a statutory and due process right to competent counsel in dependency proceedings, a comparable mechanism for challenging the adequacy of their representation by appointed counsel has been recognized by the courts." (*Ibid.*; accord, *In re M.P.* (2013) 217 Cal.App.4th 441, 455; *In re V.V.* (2010) 188 Cal.App.4th 392, 398.) Relying on the *Marsden* model, juvenile courts have permitted the parents in dependency cases "to air their complaints about appointed counsel and request new counsel be appointed." (*In re V.V.*, at p. 398.)

When a criminal defendant brings a *Marsden* motion to substitute appointed counsel, " 'the trial court must permit the defendant to explain the basis of his contention and to relate

18

specific instances of inadequate performance.  A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599.)  " 'We review the denial of a *Marsden* motion for abuse of discretion.' [Citation.]  'Denial is not an abuse of discretion "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 230.)

In this case, the juvenile court did not abuse its discretion in denying Father's *Marsden* motion.  The court allowed Father to explain why he was seeking the appointment of new counsel and to provide any examples of inadequate performance by his current attorney.  The court also allowed counsel an opportunity to respond to Father's reported complaints about a lack of contact and lack of preparation.  In addition, the court indicated that it was willing to grant a continuance of the adjudication hearing if counsel needed additional time to gather evidence or investigate the case.  Indeed, immediately following the *Marsden* hearing, the court granted counsel's continuance request so that she could review documents that she recently received from Father.  Based on the totality of information presented at the *Marsden* hearing, the court reasonably determined that Father and his counsel had not become embroiled in such an irreconcilable conflict that ineffective representation was likely to result.

Father also argues that, following the denial of his *Marsden* motion, his counsel provided ineffective assistance in preparing and presenting his case.  "A parent seeking to establish

19

ineffective assistance of counsel must show both that counsel failed to act in a manner to be expected of a reasonably competent attorney practicing in the field of juvenile dependency law, and that it is ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*In re M.F.* (2022) 74 Cal.App.5th 86, 108–109.) On direct appeal, "appellate courts further limit their review to consider only those claims ' "where 'there simply could be no satisfactory explanation' " ' " for the alleged error. (*Id.* at p. 109.)

Here, Father's complaints about his counsel's performance generally concern the tactical decisions that his attorney made about what evidence to offer or object to at the adjudication hearing. In particular, Father asserts that his counsel failed to object to hearsay statements in DCFS's reports, to cross-examine the social worker about the contents of the reports, to offer into evidence unspecified records from the family law case, and to timely obtain and present the children's most recent medical records. On this record, however, we cannot say that counsel's decisions about how to best present Father's case to the juvenile court "had no rational tactical purpose," or that Father would have obtained a more favorable result "but for [his] counsel's failings." (*In re N.S.* (2020) 55 Cal.App.5th 816, 843.) Father's ineffective assistance claim accordingly fails.

**2.      Exclusion of Father's character reference evidence**

Father argues the juvenile court erred in refusing to admit the numerous character reference letters that his counsel offered into evidence at the jurisdictional and dispositional hearing. We find no abuse of discretion in the juvenile court's ruling.

20

A juvenile court is vested with broad discretion in ruling on the admissibility of evidence.  (*In re A.S.* (2018) 28 Cal.App.5th 131, 153.)  The court's evidentiary ruling will be reversed only if there is a clear showing that it exceeded the bounds of reason.  (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 121.)  Even where the court abuses its discretion in ruling on the admissibility of evidence, " '[a] judgment shall not be reversed by reason of erroneous exclusion of evidence unless a miscarriage of justice is shown.' "  (*In re N.V.* (2010) 189 Cal.App.4th 25, 31.)  In a dependency case, a miscarriage of justice is shown "only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error."  (*In re Celine R.* (2003) 31 Cal.4th 45, 60.)  " 'While a parent in a juvenile dependency proceeding has a due process right to a meaningful hearing with the opportunity to present evidence,' " the right to present evidence " 'is limited to relevant evidence of significant probative value to the issue before the court.' "  (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 733.)

Here, Father's proffered evidence consisted of 21 character reference letters.  The majority of the letters were from Father's friends and fellow church members, and described his positive relationship with his children.  A letter from Father's pastor explained that the church Father attended was not opposed to modern medicine, and a letter from Mother's sister described Mother's alleged character for dishonesty.  While some of the letters were dated in October or December 2023, most were undated.  None of the authors of the letters were offered as witnesses at the jurisdictional and dispositional hearing.

The juvenile court acted within its broad discretion in excluding this evidence.  As DSCF's counsel pointed out at the

21

hearing, Father had not disclosed the names of the letters' authors to DCFS, nor provided any indication that these individuals might have relevant information. Because none of the authors were present to testify at the hearing, they could not be subject to cross-examination about the content of their letters. In addition, the court reasonably could find that the letters had minimal relevance to the issues before it. There was no dispute that Father had a loving and caring relationship with children. The pertinent question before the court was whether Father medically neglected J.F., and whether such conduct placed the children at substantial risk of harm at the time of the jurisdictional and dispositional hearing. The letters describing Father's strong character and positive interactions with the children were not directly probative on any disputed issue.

Moreover, even if we were to conclude that the juvenile court abused its discretion in refusing to admit the evidence, any such error would have been harmless. Father has not shown there is a reasonable probability that he would have obtained a more favorable result had the court considered the character reference letters at either the jurisdictional or dispositional stage of the proceedings. On this record, Father has failed to demonstrate reversible error in the juvenile court's ruling.

3. **Sufficiency of the evidence supporting the jurisdictional findings and dispositional order**

Father challenges the sufficiency of the evidence supporting the juvenile court's jurisdictional findings and dispositional order. He argues the evidence was insufficient to show that he medically neglected J.F. in July 2023, or that the children were at risk of such neglect in the future. He also asserts there was insufficient evidence to establish that the

children would be at substantial risk of harm if returned to his care, or that removal was the only reasonable means of protecting them from that risk.  We conclude substantial evidence supported the juvenile court's exercise of jurisdiction over the children and its order removing them from Father's custody.

### 3.1.  Standard of review

We review challenges to the sufficiency of the evidence underlying jurisdictional findings and dispositional orders for substantial evidence.  (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*Ibid*.)  "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

### 3.2.  Substantial evidence supported the jurisdictional findings

In exercising jurisdiction, the juvenile court sustained the following language in counts b-1 and j-1 of the section 300 petition:  "The child [J.F.] suffers from asthma.  On 07/07/2023, the child was medically examined and found to be suffering from increased difficulty breathing secondary to an asthma attack.  The child's airways were very swollen and the child's oxygen level was very low and required continuous breathing treatments, oxygen and medication to help reverse the child's condition.

23

On 07/07/2023, the child's father . . . left the hospital with the child against medical advice.  On 07/08/2023, the child was medically examined and diagnosed with status asthmaticus.  Such medical neglect of the child [J.F.] on the part of the father endangers the child's physical health and safety, and places the child and the child's sibling [A.F.] at risk of serious physical harm, damage, danger and medical neglect."

Section 300, subdivision (b), provides that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child."  (*Id*., subd. (b)(1)(A).)  Under section 300, subdivision (j), the court may assert jurisdiction if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."  (*Id*., subd. (j).)  "Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.  [Citations.]  The court may consider past events in deciding whether a child presently needs the court's protection."  (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601–602.)  " 'A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." ' "  (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)

In this case, the juvenile court reasonably could find that Father medically neglected J.F. in July 2023.  The evidence showed that J.F. suffered from chronic asthma, and that the child

24

required significant medical intervention on July 7, 2023, due to swollen airways and difficulty breathing. The emergency room physician who treated J.F. that day decided the child would need to be admitted to the hospital and likely placed in the intensive care unit for continued oxygen and other treatment. However, when Father arrived at the hospital, he insisted on taking J.F. home against the doctor's medical advice. Even after the doctor explained the seriousness of J.F.'s condition and expressed that she could not be certain whether he would die if he left the hospital, Father still chose to take the child home. While Father claimed that he decided to remove J.F. from the hospital because a respiratory therapist told him the child was fine, the therapist who treated J.F. denied ever making this statement. The evidence further showed that, when Mother brought J.F. back to the emergency room the following day, Father became disruptive and had to be escorted from the premises by the police because he refused to comply with the hospital staff's directives. The hospital social worker who met with Father on that occasion observed that he was more focused on his conflict with Mother than on the well-being of his child.

The juvenile court also reasonably could find that both J.F. and A.F. were at substantial risk of harm at the time of the jurisdictional and dispositional hearing. During his testimony at the hearing, Father maintained that he did not medically neglect J.F. when he removed him from the hospital in July 2023 because Father believed the child merely had a cold and needed to rest at home. Even though the treating physician determined that J.F. needed supplemental oxygen and other interventions because of his difficulty breathing, Father testified that the child "was doing well" when he first saw him at the hospital and "was in the exact

same state" as when he left Father's home earlier that day. Moreover, despite the overwhelming evidence that Father took J.F. home against the doctor's advice, Father testified that he was not aware of any medical advisement that the child needed to remain hospitalized for further breathing treatments. A parent's refusal to accept responsibility for the conduct giving rise to the dependency proceedings supports a finding the child faces a current risk of harm. (*In re E.E.* (2020) 49 Cal.App.5th 195, 213; *In re D.B.* (2020) 48 Cal.App.5th 613, 622.) Indeed, "[o]ne cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) Given Father's failure to recognize how his medical neglect of J.F. placed the child in imminent physical danger, the court reasonably could infer that there was an ongoing risk that A.F.'s medical needs would likewise be neglected. On this record, the juvenile court's exercise of jurisdiction was supported by substantial evidence.

### 3.3. Substantial evidence supported the dispositional order

" 'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.' " (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065.) In determining whether to remove a child, the court "may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)

The court "must also consider whether there are any reasonable protective measures and services that can be implemented to prevent the child's removal from the parent's physical custody." (*Ibid*.) "The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." *(In re T.W.* (2013) 214 Cal.App.4th 1154, 1163; accord, *In re D.B.*, at p. 328.)

Here, the same evidence that supported the juvenile court's jurisdictional findings based on Father's medical neglect of J.F. also supported its removal order. (§ 361, subd. (c)(1); *In re D.B.*, *supra*, 26 Cal.App.5th at p. 332.) Throughout the dependency proceedings, Father continued to deny that he endangered J.F. when he took the child from the hospital against medical advice. In his testimony, Father made clear that he believed that his own assessment of J.F.'s medical condition was superior to that of the attending doctors at CHLA. He also continued to rationalize his decision to remove the child from the hospital despite the doctor's warning that doing so placed the child in danger. Father failed to show that he gained any insight into the issues that gave rise to these proceedings. Instead, he testified that Mother initiated the dependency case as part of a plan to regain custody of the children after she lost custody in the family law case.

Furthermore, the record shows that Father repeatedly refused to cooperate with DCFS or to allow a safety inspection of his home in violation of the juvenile court's order. When asked at the jurisdictional and dispositional hearing whether he would be willing to grant DCFS and the children's counsel access to his home without recording them, Father stated that he "would take it as a situation by situation." Contrary to Father's claim, the juvenile court did not base its removal order on his inability to

27

get along with the case social worker.  Rather, the court explained that it was basing its decision on Father's resistance to following medical advice and his pattern of placing other concerns before the children's well-being.  In challenging both the jurisdictional findings and removal order, Father also claims that DCFS misrepresented the extent of J.F.'s illness as evidenced by the medical reports.  The record, however, shows that the medical team at CHLA who treated J.F. in July 2023 regarded his condition as serious, and strongly believed that removing the child from the hospital without further treatment would place him in imminent danger.  Given the totality of the record, the court reasonably could find that Father's conduct posed a substantial risk of harm to his children, and that such risk could only be obviated by removing the children from his custody.  The juvenile court's removal order was supported by substantial evidence.

**4.      Order terminating jurisdiction over the children**

Father argues the juvenile court failed to properly apply section 361.2 when it placed the children with Mother at the jurisdictional and dispositional hearing.  Father asserts that when, as here, the juvenile court places a child with a previously noncustodial parent under section 361.2, it "may not terminate jurisdiction until it analyzes in a subsequent hearing whether ongoing supervision of the child is necessary."  Father's claim is legally incorrect.

Section 361.2 governs the placement of a child following removal from a parent's custody.  It states, in relevant part, that "[i]f a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events

28

or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (*Id.*, subd. (a).)

Under section 361.2, subdivision (b), once the juvenile court places the child with a noncustodial parent, it has three options on how to proceed. (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1281; *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1243.) "The court may order the noncustodial parent to assume custody of the child, terminate juvenile court jurisdiction and enter a custody order. (§ 361.2, subd. (b)(1).) It may continue juvenile court jurisdiction and require a home visit within three months, after which the court may make orders as provided in subdivision (b)(1), (2) or (3). (§ 361.2, subd. (b)(2).) Or the court may order reunification services to be provided to either or both parents and determine at a later review hearing under section 366.3 which parent, if either, shall have custody of the child. (§ 361.2, subd. (b)(3).)" (*In re Karla C.*, at p. 1243.)

Here, the juvenile court chose the first option. After removing the children from Father's custody, the court placed them with Mother as a nonoffending and previously noncustodial parent. The court then terminated its jurisdiction over the children and issued a juvenile custody order that granted joint legal custody to both parents, sole physical custody to Mother, and supervised visitation to Father. In deciding to terminate jurisdiction, the court found that continued supervision over the children was not necessary, and that releasing the children to

29

Mother's custody would not be detrimental to their safety, protection, and physical or emotional well-being.

Citing *In re Austin P.* (2004) 118 Cal.App.4th 1124 (*Austin P.*), Father contends the juvenile court lacked the authority to terminate jurisdiction at the dispositional hearing, and instead was required to hold a separate hearing to determine whether continued supervision was necessary. That case however, solely concerned whether the juvenile court was required to terminate its jurisdiction once it placed a child with a noncustodial parent under section 361.2. *Austin P.* concluded that, based on the plain language of section 361.2, subdivision (b), the juvenile court had the option "to grant 'custody' to the nonoffending noncustodial parent, but continue its jurisdiction and provide reunification services to either the offending parent, the nonoffending parent, or both parents." (*Austin P.*, at p. 1131.) However, *Austin P.* also expressly recognized that there was another option under section 361.2, subdivision (b), which was to "grant sole legal and physical custody to the nonoffending noncustodial parent and terminate jurisdiction." (*Austin P.*, at p. 1131.)

Section 361.2 therefore "permits the juvenile court to terminate its jurisdiction at disposition after placing the dependent child with a noncustodial parent and ordering that parent to become the legal and physical custodian of the child." (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 208–209.) The court also "retains the discretion in an appropriate case to terminate its jurisdiction at the close of a disposition hearing when it finds services and continued court supervision are not necessary to protect the child." (*Id.* at p. 208.) As our colleagues in Division Seven explained, to "hold otherwise and conclude that court supervision must be continued, even absent a continuing risk of

harm, simply because the protective and custody orders that eliminated the risk were made at the conclusion of a disposition hearing, rather than a subsequent review hearing, would be wholly at odds with the fundamental goal of the dependency system to return the child to his or her custodial parent and terminate dependency jurisdiction as soon as circumstances permit." (*Ibid*.) The order terminating jurisdiction at the close of the jurisdictional and dispositional hearing thus complied with section 361.2.

**5.     Order for supervised visitation for Father**

Last, Father challenges the juvenile court's custody order restricting his contact with the children to supervised visitation. He claims the visitation order must be reversed because it lacked any legal or factual support. We disagree.

When terminating jurisdiction over a dependent child, section 362.4 authorizes the juvenile court to issue "an order determining the custody of, or visitation with, the child." (*Id*., subd. (a).) Section 362.4 further provides that the order "shall continue until modified or terminated by a subsequent order of the superior court," and directs that the order be filed in a pending family court proceeding (*id*., subd. (b)) or, if there is none, as part of a new family court file (*id*., subd. (c)). In making a custody or visitation order under section 362.4 (commonly referred to as an "exit order"), the court's " 'focus and primary consideration must always be the best interests of the child.' " (*In re T.S.* (2020) 52 Cal.App.5th 503, 513.) The juvenile court is not restrained by any preferences or presumptions that ordinarily apply in family court. (*In re Nicholas H*. (2003) 112 Cal.App.4th 251, 268.) We review a juvenile court's exit order for abuse of discretion. (*In re M.R.* (2017) 7 Cal.App.5th 886, 902.)

31

In this case, we find no abuse of discretion in the juvenile court's order for supervised visitation for Father. As previously discussed, the evidence showed that J.F. suffered from chronic breathing issues related to asthma, which periodically required prompt medical attention, and at times, even hospitalization. When Father removed J.F. from the hospital while the child was receiving necessary medical treatment, he placed his child at risk of serious harm, but never accepted responsibility for his conduct. Furthermore, throughout the proceedings, Father repeatedly denied DCFS access to his home for a safety inspection, failed to provide DCFS with the requested medical information about the children, and refused to make the children available to their counsel or the case social worker. Father took these actions in direct violation of the juvenile court's orders, and continued to do so even after the court informed Father that he needed to comply.

Shortly before the January 26, 2024 hearing on the custody and visitation order, Father brought the children into his home because he assumed jurisdiction had been terminated and he was free to do so. Given Father's willingness to disregard the advice of the children's doctors and the court orders with which he personally disagreed, the juvenile court reasonably could find that the children's best interests required that their visits with Father remain supervised. On this record, the juvenile court did not abuse its discretion in issuing the visitation order.

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional orders are affirmed.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

WILEY, J.